Winter vs. Bandel, et al.

---

## WINTER VS. BANDEL, et al.

1. CONTINUANCE.

    A party is not entitled to a continuance on account of the absence of a witness before the issues to which the testimony is applicable are made up.

2. PLEADING; *Effect of failure to deny a material allegation.*

    A material fact, alleged in the complaint and not denied in the answer, will be taken as admitted.

3. EVIDENCE: *Facts tending to show knowledge in the plaintiff, in an action for deceit, admissible.*

    In an action for fraudulently misrepresenting the value of claims transferred to the plaintiff by the defendant, in payment for property sold the defendant, the plaintiff's knowledge of the country and the condition of the parties owing the claims, or information in respect thereof, is material, and evidence bearing on the point should not be rejected.

Winter vs. Bandel, et al.

4. ————: *Tax books admissible to prove the solvency of a third person.*

Where the solvency of one not a party to the action is in issue, the tax books, being made up by sworn officers, and, as to personalty, based on, the sworn statements of the property owners, is admissible in evidence.

5. ————: *Insolvency of third person, how proven.*

In an action for fraudulent misrepresentation as to the solvency of another, it is not necessary to show a judgment execution and return of *nulla bona.*

6. FRAUDULENT MISREPRESENTATION.

In order to vitiate a contract on the ground of fraudulent misrepresentation, the misrepresentation must relate to a matter material to the contract, and in regard to which the other party had a right to, and did, to his injury, rely on it; the fact that he was in part influenced by other causes will not affect it, if his principal reliance was on the fraudulent representations.

7. FRAUDULENT WARRANTY: *Election of remedies.*

Where there is a false and fraudulent warranty, the party may elect either to sue on the warranty, or rescind the contract and sue in tort for the deceit.

8. FRAUDULENT MISREPRESENTATION: *Circumstances tending to rebut should be brought to the attention of the jury.*

In an action for fraudulently misrepresenting the value of notes transferred to the plaintiff in payment for property purchased by the defendant, evidence that the defendant paid more, estimating the notes at their face, than the market value of the property, and refused to indorse the notes, should be brought to the attention of the jury, as circumstances tending to prove that the plaintiff took the notes at his own risk and with knowledge of their value.

9. ARGUMENT: *Refusal of the Circuit Court to hear, not cause of reversal.*

This court will not reverse a judgment because the court below refused to hear argument on the instructions, where the circumstances of the refusal are not shown.

APPEAL from *Ouachita* Circuit Court.

Hon. JAMES T. ELLIOTT, Circuit Judge.

*Compton, Martin & Parsons,* for appellant.

The refusal to continue for the evidence of Atkins was, under the circumstances, an abuse of discretion. *McDonald* v. *Smith,* 21 Ark., 460; *Hensley, et al.,* v. *Tucker,* 5 Eng., 528; *Evans* v. *Parsel,* 30 Miss., (9 Jones,) 235; *Payne* v. *Cox,* 13 Texas, 480; *Welsh* v. *Savary,* 4 Iowa, 241.

Tax books not proper evidence of solvency. *Taylor* v. *Auditor*, 4 Ark., 574.

Court erred in overruling the questions asked to lay a foundation for impeaching the testimony of Bozarth and Bandel. *Brown* v. *State*, 24 Ark., 620; *Milan* v. *State*, 24 Ark., 354. Also in overruling question concerning conversation with Leake. *Hill* v. *Bush*, and cases cited, 19 Ark., 522.

As to representations, see *Dugan* v. *Cureton*, 1 Ark., 31; *Hawkins* v. *Campbell*, 1 Eng., 531; *Dillard* v. *Moore*, 2 Eng., 167; *Yeates* v. *Pryor*, 11 Ark., 58; *Hill* v. *Bush, supra; Wilson* v. *Strahorn*, 26 Ark., 31.

The court erred in instructions. *Bank* v. *Hubbard*, 3 Eng., 183; *Worthington* v. *Curd*, 15 Ark., 492, *et passim; Armstead* v. *Brooks*, 18 Ark., 521; *Bertrand* v. *Byrd*, 5 Ark., 65; *Grider and wife* v. *Clopton*, 27 Ark., 256; and in refusing instructions asked by appellant.

Verdict is against law, and instructions, and unsupported by evidence, and should be set aside. *Dodd* v. *McGraw*, 8 Ark., 83. No fraud without knowledge of the falsity. *Plant* v. *Condit*, 22 Ark., 454; *Morton* v. *Scull*, 23 Ark., 289.

The damages are not supported by the evidence, and are obviously excessive.

S. W. WILLIAMS, SP. J.:

The appellees sued appellant in the Circuit Court of Ouachita county, to the February term, 1874. The complaint states that about the 8th day of January, 1874, they agreed to sell and deliver to defendant, Moses Winter, thirty-three head of horses and mules, of the value of thirty-nine hundred and sixty dollars, to be paid for by said defendant in promissory notes on solvent parties, less the sum of five hundred and thirty-two dollars in money paid plaintiffs by defendant, at the time said horses and mules were delivered to defendant; that said defendant, Moses Winter, then delivered to said plaintiffs promissory notes to the

Winter vs. Bandel, et al.

amount of thirty-three hundred and eighty-one dollars and seven cents, which said promissory notes said Moses Winter falsely and fraudulently represented to plaintiffs to be good and on solvent parties, well knowing at the time that the same were worthless, and the makers thereof were insolvent, and the money on said notes cannot and could not be made by process of law. A list of the notes is exhibited, and the complaint further states that Winter well knew at the time that said promissory notes were worthless, and fraudulently and falsely represented to plaintiff that said notes were valuable, with the fraudulent intent to cheat and defraud plaintiffs; that by reason of the false and fraudulent representation of the solvency of the makers of said notes, respectively, the defendant induced the plaintiffs to deliver him said horses and mules, and execute to him a bill of sale therefor, and receive in payment for the same, said notes. The plaintiffs ascertained, after they had received said notes, upon the false and fraudulent representation of said defendant as aforesaid, that the same were of no value, and offered to return the same and receive back said horses and mules and place said defendant, Moses Winter, and the plaintiffs in the same condition they were in before said trade was made. But Winter refused to receive the notes and return the horses and mules. Damages laid at three thousand dollars.

The list of notes attached to the complaint, embraced twenty-nine different names and thirty notes (two of them being on the same person). The notes range in amounts from fifteen dollars and seventy cents, the smallest, to five hundred and fifty dollars and seven cents, the last being amount of note on Wesley Charles, of whom one witness says he is right pert, has a little more property than most niggers.

On this complaint summons was issued, on 29th of January, 1874, for the 16th of February following, and was served on the day of its date.

At the return term, on the 27th of February, 1874, the defendant made a motion for a continuance, for want of the testimony of one Atkins, by whom he stated that he expected to prove material facts for his defense, and stating in general terms that he had used due diligence. The court properly overruled this motion, for the facts constituting this diligence should be stated and let the court decide the question of diligence.

The defendant then filed a new motion on 6th March, in which he stated additional facts to be proven by some other witness, and which seem, in view of the issue made, to have been material; he states that he had a subpœna issued, as soon as it was practicable to *do so*, for the witness in time for service ten days before the term, but for the departure of the witness for Texas, where defendant had been informed he had gone.

The application for a continuance is addressed to the sound discretion of the court, and we will not interfere with this discretion except where it is grossly abused.

The last motion was presented, the record shows, on 6th March, more than a month after service near the Texas border, and how soon it was practicable to issue the subpœna is not stated, nor is the day stated, except the court might infer from the general statement, "in time to have been served ten days." There is nothing from which the time of issuing the subpœna could be inferred; and the recent departure of the witness for Texas, and the apparent want of knowledge of that fact by the defendant below, and the absence of any excuse for failing to take steps to get the witnesses' deposition from Texas; and that the same motion had been overruled a week before are all sufficient reasons for denying it; and the absence of any negative on the part of Winter that this sudden disappearance of the witness was not by his procurement, would be an additional reason, although we know that the last is not among the statutory requirements, yet under circumstances of suspicion, the court

has the discretionary power, in addition to the statutory causes, to require the party applying for a continuance to negative any suspicious fact or circumstance disclosed on the face of the affidavit; all these are reasons why we will not disturb the action of the court below, however much we may differ with that court in the exercise of its discretion.

There is another reason, the first motion to continue should have been overruled, and that was because, by the record, (where we must look for the ruling and order of the court,) it appears that the answer was not then filed, and was not until a week thereafter. The court should not continue a cause for an absent witness, before the issues, as to which his testimony is applicable, are made up; and the refusal to do so is certainly not an abuse of discretion.

We thus dispose of this question, which was made one of the grounds for motion for new trial and was properly saved by bill of exceptions.

On the 6th of March, defendant below filed his answer, which admits the sale of the horses and mules to him by plaintiffs below, with this difference, that he states that he paid three hundred dollars in money, thirty-six hundred and six dollars in notes and accounts.

This discrepancy is perhaps accounted for in the testimony, where it is shown that after the trade, a certain note was given back in exchange for some coats, and a livery stable bill was paid, which perhaps makes the $532 stated by plaintiffs below to have been paid in cash, while defendant below may perhaps claim the whole amount of notes originally delivered without regard to the return, only $3381.07 in notes are produced, or accounted for in the case.

Defendant below, in his answer, denies in detail all the charges of fraud, and denies that he represented the notes delivered to

plaintiffs to be good and on solvent parties. But that plaintiffs, through their agent, Robert R. Sherman, chose and selected the notes from defendant's claims, and took and received them on their own judgment and at their own risk, without any fraudulent representation on the part of defendant, that the same were on good and solvent parties, or as to their character or value, and plaintiffs thereupon gave defendant a bill of sale of the horses and mules, which is exhibited.

It is a noticeable feature in this answer, that notwithstanding Winter received those horses of plaintiffs below, who were proven to be Missouri horse drovers and perfect strangers in the country. Winter nowhere in this answer or in his testimony, pretends even, that these notes or any of them, were on solvent parties; he only denies the fraudulent representation. Under that rule of common law pleading which indulges the strongest intendment against a pleader for omissions, and under that positive rule of the Code which provides that all facts not denied in the answer shall be regarded as admitted, (Gantt's Digest, 4608.), we shall receive it as an admitted fact, that these notes were upon insolvent parties, and may thus dispose of a question, which notwithstanding this admission in the pleadings, the plaintiffs voluntarily assumed the burden of proving, and lugged in witness after witness to establish an admitted fact, and after the defendant below in his testimony, had failed utterly even to pretend that the notes were on solvent parties, we find a string of instructions asked on the one hand and contested on the other, looking to the grade of evidence required to establish this admitted fact.

This is the tendency of Code pleading; attorneys try causes upon the facts, regardless of the issue presented upon the record, when they can be so easily altered or changed to suit the exigencies of the trial.

The cause was tried on the 6th day of March, 1874. Verdict for plaintiff below for twenty-five hundred dollars. Winter filed his motion for a new trial, setting up as cause for same :

*First*—The verdict was contrary to the evidence. *Second*— The verdict was contrary to law. *Third*—The court refused legal evidence offered to the jury by defendant. *Fourth*—The court admitted illegal evidence to the jury on the part of the plaintiff. *Fifth*—The court erred in instructing the jury in certain enumerated instructions asked by plaintiffs. *Sixth*—The court refused to pive certain other enumerated instructions asked by defendant. *Seventh*—The court modified and changed defendant's instructions against his consent. *Eighth*—The court refused to grant defendant a continuance. *Ninth*—The damages are excessive.

The court below overruled and refused this motion for new trial, and Winter filed his bill of exceptions to this ruling, in which he sets out all the evidence and instructions of the court below, and appealed to this court.

The testimony is extensive and conflicting as to the fact of whether or not plaintiffs below really had knowledge of the solvency of the makers of the notes at the time they traded, and as to whether they took the notes at their own risk. We do not deem it necessary to go into the facts in detail, and, in view of the ultimate conclusion at which we have arrived, as indicated below, it would be improper for us, in reference to the probable future disposition of the case, to intimate our views as to the preponderance of the testimony. Suffice it to say that there is some evidence to sustain the verdict, and under the well established rule we would not disturb the verdict on the ground of its being contrary to testimony.

The first and second grounds for the motion for new trial, if alone, would be refused ; as to the third ground, that the court

refused legal evidence offered by defendant, we think this point well taken. During the examination of plaintiffs below, William Bozarth and Frederick Bandel, as witnesses, defendants below, asked each of the witnesses the following question: 'Did you, on the 8th day of January, 1874, at the livery stable of G. H. Gainsel, in Camden, Arkansas, tell J. H. Gainsel, J. T. Clark and Henry C. Davis that you knew this country as well as anybody, and knew what notes were good and what were bad ?'"

To this question the plaintiffs objected, and defendant explained to the court that the question was asked for the purpose of laying a foundation for the invalidation of the witnesses' testimony, but the court refused, on objection of plaintiffs below, to allow the question to be put to the witnesses or answered by them.

The fact of the knowledge or ignorance of plaintiffs below of that country and its people was a very relevant and material fact, for superior knowledge on Winters' part of his own customers, and the representation which he is proven to have made, that he sold the payers of the notes goods for them, coupled with the fact that plaintiffs were strange horse drovers from another State, was calculated to have its influence on the minds of the jury, perhaps to the extent that the mere fact that Winters, a merchant, had thought them good enough to sell goods to on a credit to the extent, in one instance, at least, of $450, was a sort of index to show that the notes could be collected ; therefore, any testimony tending to show knowledge of the country was material to the defense, and the proper foundation was laid of time, place and person to contradict, and the court in excluding the question erred.

The defendant also asked the same witnesses the following question :   " What conversation occurred between you and W. W. Leake, at the office of Leake and Salle, a few days prior to

the consummation of the trade, in regard to the difficulties about collecting paper in this country, the obstacles created by law, and the ordinary solvency of paper taken by merchants in Camden on parties in the country, and whether or not Winter procured the interview between you and Mr. Leake?"

To this question plaintiffs objected, and the court sustained the objection.

In view of what these witnesses had said about this matter of being at Leake's office in their examination in chief, and the interview there, and in view of the materiality of the fact itself as tending to show that the plaintiffs below had knowledge of the uncertainty of the paper they were getting, it was all material, and this question in cross examination, appearing to be responsive to the examination in chief and relevant, the court erred in excluding the question.

*Fourth*—The court admitted illegal evidence on the part of the plaintiffs.

This fourth ground for new trial was based upon exceptions taken by defendant below to the ruling of the court in allowing the tax books of Ouachita county to be offered in evidence to prove that the payers of the notes had no property above legal exemption, and five out of the twenty-nine were not on the book at all.

The assessor had been sworn as to the matter, and the tax books being made and entered by a sworn officer, and made up as to personalty at least, upon the sworn statements of the owners, we think if the fact of insolvency had needed other proof than the implied admissions of the answer, the tax book was evidence tending to prove the fact one way or the other.

The jury should have received it for what it was worth.

Another exception taken by Winter was to the reception of parol evidence of the insolvency of the debtors, contending that

suit should have been brought and the parties pushed to insolvency by legal process.

Winters is singularly inconsistent. He objects to a tax book which is then before the court, because it is notorious that a tax book shows too low a valuation, and is made up by an officer *ex parte*, without his knowledge, and yet he insists upon a legal proceeding made up between plaintiffs and the payers of the notes, in a proceeding to which he is not a party, either, as the only evidence of insolvency, when it is equally notorious that executions are often returned *nulla bona* when property might be found to satisfy it. Legal process and return of *nulla bona* is evidence of insolvency. But when this insolvency is the constituent element of a fraud, it is not the only evidence. There is nothing in the fourth ground.

The fifth ground of the motion is, that the court wrongfully gave the first, second, third, fourth, sixth, seventh, ninth, tenth, eleventh and twelfth instructions asked for by the plaintiffs.

In order to fully present the law questions involved in the instructions, it will be best to state the law regulating the question of fraud, as far as it may be defined by standard authority.

Fraud consists in the misrepresentation or concealment of a material fact calculated to deceive and mislead the opposite party.

The law requires each contracting party to be vigilant, and exercise a due degree of caution. *Dillon* v. *Moore*, 7 Ark., 167.

It is impossible to minutely define that precise state of knowledge and overreaching cunning on the one hand, and confiding ignorance on the other, which it takes to make out the case. Parsons, in his work on contracts, says: " A certain amount of selfish cunning passes unrecognized by the law, that any man may procure to himself in his dealings with other men some advantages to which he has no moral right, and yet succeed perfectly in establishing his legal right to them. But it follows

also, that, if any one carries this too far, if by craft and selfish contrivance he inflicts injury upon his neighbor, and acquires a benefit to himself beyond a certain point, the law steps in, and annuls all that he has done, as a violation of law. The practical question then is, where is this point; and to this question the law gives no specific answer, and it is somewhat noticeable that the common law not only gives no definition of fraud, but perhaps asserts as a principle that there shall be no definition of it, and the reason of this rule is easily seen. It is of the very nature and essence of fraud to elude all laws, and violate them in fact without appearing to break them in form, and if there were a technical definition of fraud, and everything must come within the scope of its words before the law could deal with it as fraud, the very definition would give to the crafty just what they wanted, for it would tell precisely how to avoid the grasp of the law. Whenever, therefore, any court has before it a case in which one has injured another, directly or indirectly, by falsehood or artifice, it is for the court to determine in that case whether what was done amounts to cognizable fraud; still, this important question is not left to the arbitrary, or, as it might be, accidental decision of each court, in each case, for all courts are governed by certain rules." 2 Parsons on Contracts, 769.

The rules are: *First*—That the fraud must be material to the contract and relate to it. *Second*—It must work an injury. *Third*—The injured party must not only have relied upon the fraudulent statement, but have had a right to rely upon it in full belief of its truth, for otherwise it was his fault or folly, and he cannot ask of the law to relieve him from the consequences.

If, however, the plaintiff mainly and substantially relied upon the fraudulent representation, he will have his action for the actual damage he sustains, although he was in part influenced by other causes. 2 Parsons Cont., 773. Tested by these rules laid

down by Mr. Parsons, which are well sustained by author-
ities and decisions, both English and American, we will
examine the instructions. The first instruction is as fol-
lows: *First*—Fraud avoids a contract *ab initio*, both at law
and in equity, whether committed by a party or his authorized
agent. That is law laid down in the language of this court,
substantially, in *Strayhorn* v. *Giles*, 22 Ark., 517.

*Second*—The second instruction is in these words : The misrep-
resentation of a fact, known by the party making the statement
to be untrue, amounts to a fraud in law, if the misrepresentation
be naturally calculated, or be expressly intended to induce a
person to act thereon, so that he may be prejudiced. There is
no substantial objection to this as applied to the facts of this case.

The other instruction given for plaintiff below, to the giving
of which defendants below excepted, are as follows :

*Third*—The law requires good faith and fair dealing between
the parties to a contract, and it is well settled both at law and in
equity that a contract may be avoided for a fraudulent conceal-
ment or misrepresentation of a material fact or defect known to
the vendor and not discoverable on ordinary inspection by the
vendee. And if the jury find from the evidence that said notes
or any of them were worthless, and not on solvent parties, and that
the defendant fraudulently concealed such facts from the plain-
tiffs they may find for the plaintiffs.

*Fourth*—If the jury believe, from the evidence, that the de-
fendant at the time he delivered said notes to the plaintiffs knew
that the makers of the same, or any of them, were insolvent and he
he induced the plaintiffs, by means of surreptitious information,
to believe them to be good and on solvent parties, and that said
notes were wholly an inadequate compensation for the value of
said horses and mules, they may find for the plaintiffs.

*Sixth*—If the jury believe from the evidence that the defend-
ant, falsely and with intent to cheat and defraud the plaintiffs,

represented said notes to be good, and on solvent parties and collectable by law, and that plaintiffs were prejudiced by such representations, they may find for the plaintiffs.

*Seventh*—If the jury find from the evidence that defendant by falsely representing said notes to be good, and on solvent parties, induced the plaintiffs to sell and deliver to the defendant thirty-three head of horses and mules, and accept said notes in part payment for the same, and executed to him a bill of sale therefor, and that plaintiffs have been damaged, they may find for the plaintiffs.

*Ninth*—The jury will render their verdict in accordance with the preponderance of the testimony that they may believe to be true.

*Tenth*—If the jury find for the plaintiffs they may assess the damage according to the proof, in any sum not exceeding three thousand dollars.

*Eleventh*—In order to make the defendant liable in damages for his false misrepresentation and fraudulent concealment of the solvency or insolvency of said notes, it is not necessary that he should have endorsed the same, nor is it necessary that the plaintiffs should have first sued the makers to insolvency.

*Twelfth*—If the jury find from the evidence that the defendant intentionally misrepresented a material fact, or that he produced a false impression by either words or acts, in order to mislead or to obtain an advantage of the plaintiffs, they may take such facts into consideration as evidence of manifest fraud.

In view of the implied admissions in the answer of the insolvency of the makers of the notes, and the established and undisputed fact that plaintiffs below, in due time, between the 8th and 29th days of January, 1874, tendered back the notes and money and demanded the horses and mules, and thereby gave notice of the purpose of rescinding the contract, we find no

substantial objection to any of these instructions, some of them are obnoxious to the objection, the result of a habit so common in this State, of stating a single proposition of correct law applicable to the case, but not involving all the law or fact involved, and asking for the jury to be instructed that on such partial proposition the jury must find for the plaintiff or defendant, as the case may be.

As the whole law cannot always be embodied in one or two propositions, this conclusion might be tolerated, if the body of the instructions so concluding contained every material proposition necessary to be established in order to entitle the party to a verdict, otherwise this stereotyped "find for the plaintiff?" had better be left off.

It was certainly an indispensable part of the plaintiff's case, which he clearly established in proof, and the fact was not denied in the answer, that he had offered to rescind the contract before suing for damages for deceit. Chitty on Contracts, page 362, *et seq.*, to 369.

Without this proof or admission, his case was not made out, and a batch of thirteen instructions, aside from the admission, ought to have contained this proposition, whereas they do not, and in view of the issue it was not necessary.

The tenth instruction confined the damage to the amount mentioned in the declaration, "in accordance with the proof," that was rather beneficial than hurtful to Winter, for the jury were told thereby that they must measure damage "in accordance with the proof," and in no event could they go beyond the amount laid in the declaration.

This confined the measure of damage to the proof of damage, when it might admit of question whether it might not have been left to the jury to say whether there was shown here such evil intent, or gross fraud, as might justify them in giving punitive

damages. Sedgwick, in his work on the measure of damages, says: "Where there is a question of fraud, malice, gross negligence or oppression, a jury may give punitive damages." See Sedgwick on Measure of Dam., page 38 (Margin); ib., 454; *Graham* v. *Roder*, 5 Texas, 141.

Mr. Sedgwick further says that, in an action *ex delicto*, there must be an evil motive in the wrongdoer in all cases to entitle the plaintiff to punitive damages. Sedgwick M. of Dam., 472, (Margin).

This case sounds in tort, and the existence of evil motive towards plaintiffs, if any, was a question for the jury, and might have been left to them by the court, although, perhaps, the evidence might not have satisfied the minds of the jury to give such damages.

The tenth instruction, however, evaded this question, and confined the jury to the damage proved within the limit laid in the declaration, to which there can be no reasonable objection.

The sixth and seventh grounds for new trial are the refusal to give, and modifications, of defendant's instructions.

The court refused the following enumerated instructions asked by the defendant to be given to the jury, or modified them, to-wit:

*First*—The ground of the charge in the plaintiff's action is that the defendant falsely represented certain papers, introduced in proof herein, as being upon good and solvent parties, and before plaintiffs can recover they must establish satisfactorily to the jury that said papers are not collectable, and *this proof can only be made by showing that the plaintiffs* have appealed to the appropriate tribunal provided by law for the enforcement of the same in a legal way.

The court below refused this instruction as asked, but gave the first part of it, modifying it by striking out all the last clause, from and including the words "this proof can only be made,"

etc. This was correct, a return of *nulla bona*, as we have before indicated, was not the only evidence of insolvency.

It ought to have been stricken out for another reason, the insolvency was admitted by the legal effect of the answer. Gantt's Digest, section 4608.

*Second*—The plaintiffs in their action charge and rely upon fraudulent representation constituting an action for deceit accruing from false representations as to the solvency of the notes in controversy, and any proof that defendant warranted the solvency of such notes necessarily destroys the truth of such charge,. for if defendant made a warranty, plaintiffs must rely on same, and bring their action thereon.

The law is generally the exact reverse of this instruction, and is so in this case. Where there is a false warranty which contains elements of fraud and deceit in it, the party has his election to affirm the contract and sue upon the breach of warranty, or repudiate it, offer a return of all which was received under it, and to rescind and sue for damages. Chitty on Contracts, 366 and 369; Chitty's Pls., 137 (margin): Dougl., 21; 2 East., 446; 2 Starkie, 162.

In this case there was an offer to rescind, and if there was fraud, the plaintiffs below thereby placed themselves in position to sue for full damages, regardless of the value of the insolvent notes.

*Fourth*—To constitute a valid contract, the parties must be able to contract, willing to contract, and have equal opportunities to investigate the subject of the contract, and actually contract thereon, and if the jury believe from the evidence that the plaintiffs in this action were capable of contracting, were willing to contract, and had an equal opportunity with defendant to make a full, fair and perfect investigation of the subject of the contract, any representation of the defendant as to the value of the

notes in controversy is immaterial, for the law presumes that any capable person, with equal opportunities to judge of the subject of the contract and its surrounding, has contracted advisedly.

This instruction was good law in a case which it fitted, but in this was abstract and misleading.

There was no evidence even tending to show equality of opportunity of judging.

The important question here was the solvency of the payers, which Winter knew better than a strange horse drover, for they were his customers; he knew them—plaintiffs did not.

The question would have been different if it had involved a question of the quality of the paper upon which the notes were written, or the penmanship, or that the notes were whole and untorn, or were eaten by mice or moth. These would have been facts patent to each alike, and in such case both having eyes must use them. But the solvency of the maker of a note is not discoverable on mere inspection. No expert has yet reached such proficiency as to be able to look at a note and tell whether its maker can pay it or not. This instruction was properly refused.

*Seventh*—If the jury find from the evidence that the defendant refused to endorse the notes in question, such refusal is *strong* evidence that the plaintiffs took said notes with the risk as to their value and collectability.

This circumstance is evidence of the fact sought to be established, but the court should not have indicated what weight the jury should give it, as intended by the mover in using the word *strong*. It was for this reason properly refused.

*Eighth*—Without a written guarantee or endorsement for a consideration of the notes in question, the defendant is only responsible for the genuineness of said notes, that his title to the same is good, that same have not been paid, and that there are no just debts against the same.

This instruction was clearly not law, and was properly refused. It, in effect, would have withdrawn from the jury the consideration of the whole question, which was one of fraud, which is a mixed question of law and fact, to be submitted to the jury under proper instructions, and to be established by competent proof. *Dodd* v. *McCraw;* 8 Ark., 83.

*Ninth*—The jury, in arriving at a conclusion in this case, must consider the opportunities of information of the respective parties, for if such means of information and inquiry are made alike accessible to both, so that with ordinary prudence or vigilance, the parties might respectively rely on their own judgment, they must be presumed to have done so ; or if they have not so informed themselves, the complaining parties must abide the consequences of their own inattention and carelessness, for if the attention of the plaintiffs was called to the veritable notes delivered to them in part payment for the horses and mules in this controversy, or to the bulk of notes out of which these notes were selected and picked, ordinary regard and attention to their own interest required them to ascertain or know the solvency or money value of such notes.

The court below refused this instruction, and gave it as modified by striking out all of it after the words "if they have not so informed themselves," inclusive.

The court should have rejected all of this instruction, for the reason, among others, which we have given for sustaining the ruling of the court below in refusing the fourth instruction, with this difference—taking the ninth entire it is not good abstract law. For if the complaining party is not informed and the other is, he certainly is not bound to hunt up evidence to convince himself, or, in default, be at the mercy of a cunning rival.

*Tenth*—In actions for deceit, before the plaintiff can recover, the jury must find that, taken by surprise, the plaintiffs relied

on the representations of defendant, but if the evidence shows that plaintiffs selected Bob Sherman, at their instance, to pick said notes out from among the lot or bulk of notes offered by defendant in part payment for the horses and mules in question, that such selection of the said Sherman, or any one else, was a waiver of any confidence or reliance they may have placed upon the representation of defendant Winter, as to the solvency or money value of said notes, so selected by the said Sherman, and delivered to and received by said plaintiffs in part payment as aforesaid, and the jury may find for defendant.

This instruction the court refused to give without adding the words "provided said Sherman had been introdued to prove the same." As Sherman had not been so introduced, this instruction lost all force.

If it had been the law that Sherman's selection by plaintiffs, after the trade, to pick out the notes, the plaintiffs were to have out of a lot of other notes, released Winter from all responsibility, then these facts could have been proven by any competent witness.

The instruction should not have been given with or without the addenda. In view of all the evidence it was calculated to mislead the jury. It was proven that Sherman was a comparative stranger himself at Camden, and that fact was unknown to plaintiffs, and the jury could have found from the evidence that Winter knew this and the apparently fair effort, and anxiety of Winter to have a third party, to be selected by plaintiffs, to pick out the notes, may have been, if he intended fraud, a part of his scheme to lull suspicion; and to relieve himself from responsibility, and when Leake and Salle and Brown, experienced attorneys, refused the work, it is a little remarkable that it should fall upon Sherman, a comparative stranger of short residence in the place, to do the work.

It ought to have been left to the jury to say what influence Winter may have gotten over plaintiffs through confidence in him, and what influence he may have had in having Sherman selected for this work, for plaintiffs swore that Winter recommended Sherman to them for it, and should not have been told that if they found the fact, which was undisputed, to be true, that Sherman was selected for this work by plaintiffs and did it for them, that Winter was thereby released and that too without regard to the character of the bundle of notes from which the selection was made, perhaps the best were insolvent.

We have not overlooked the statement that in the bundle were some better notes than those Sherman selected.

That might tend to prove either of two opposite propositions, either that Winter had ploughed plaintiffs' heifer, that is, got an undue influence over Sherman, or overreached him, or else that Sherman did not select well; nor have we overlooked that other fact stated by some witness (Davis), Winter's clerk, that Winter had told him, before the trade was completed, to take all the deed of trust notes and cotton notes, from among the other notes and put them to themselves, and he had done so before the trade was completed, and the notes given to plaintiff were taken out of the safe, and were part of the unsecured notes.

It is true that witness says that notes secured by deed of trust were always kept separate from the common run of unsecured notes, perhaps this was right, but that the pendency of these negotiations should have been contemporaneous with this order to separate the secured notes from the common lot which was given Sherman to select from, is a coincidence which might have had its significance, and this tenth instruction tended a little too much to hedge off its effects.

*Eleventh*—If the jury believe from the evidence that said stock was of dull sale in this market, and were not worth or would

.not have sold in money for over fifty dollars on an average, this is a circumstance tending to prove that defendant did not repre-.sent that said notes and accounts were good and on solvent parties, but that plaintiffs took the same on their own judgment, or that of their agent, at their own risk.

*Twelfth*—If the jury believe from the evidence that defendant, Winter, refused to indorse said notes and to guarantee the payment of the same, this is a circumstance, where the evidence is conflicting, tending to prove that plaintiffs took and received the same on their judgment and at their own risk, and if the jury believe that plaintiffs so took and received them, they will find for the defendant.

These instructions should have been given, for the great difference in price, and the refusal to guarantee or indorse, are circumstances tending to prove the supposed fact, and if plaintiffs took the paper at their own risk, with full knowledge, they were not entitled to recover.

*Thirteenth*—If the jury believe from the evidence that plaintiffs, prior to or about the time of said sale, inquired into the exemption laws of this State, and were advised as to the amount of property exempted from sale under legal process by said exemption laws, this is a circumstance, taken in connection with Winter's refusal to indorse or guarantee said notes, from which the jury may infer that plaintiffs knew, or ought to have known, that some of said notes were not collectible by legal process, and if the jury so infer they will find for the defendant.

This instruction was properly refused, for while the jury from this evidence might infer that plaintiffs might suspect that some of the notes were not collectible, which is a very doubtful infer-ence, yet such inference would not justify the jury in finding no fraud in defendant's conduct, and therefore to find for him.

This is a little too strong. Suppose they knew some of the notes to be insolvent, if enough were solvent to secure the cash

value of horses and mules, might the plaintiffs below not still have traded?

If there was no other objection, this instruction should not have been given, because, after stating but a single proposition, too narrow to cover the law of the case at best, containing but a proposition of circumstantial evidence, tending to prove a fact, and from this alone the court is asked to instruct the jury that they must "find for defendant."

*Fourteenth*—Notwithstanding the jury may believe from the evidence that the defendant represented said notes to be good and on solvent parties, yet the jury cannot find for plaintiffs in this action unless the plaintiffs have shown by evidence that they prosecuted said notes to judgment, and that execution has been returned thereon unsatisfied, or that the makers of said notes are dead and their estates insolvent and unable to pay anything on said notes.

This instruction was properly overruled.

In a suit on a contract of guarantee of solvency, it would have been correct, but in this was inapplicable for reasons above given.

The defendant excepted to the ruling of the court, in refusing him permission to argue his instructions. We are not apprised of the reasons for the refusal, or the time and circumstance of it. While a court should be always, to a reasonable extent, ready to hear argument and authority, and it is the constitutional right of litigants to be heard, yet on such questions as this there is some discretion vested in courts, and, where we find no other error, we should not reverse a case for this.

We find that the court erred as above indicated in refusing to allow the questions to be propounded to plaintiffs' witnesses, and in refusing to give the eleventh and twelfth instructions asked for by defendant, and for these errors should have sustained the motion for new trial on the third and sixth grounds, and for these errors the judgment is reversed.

Mr. Justice Harrison did not sit in this case.